In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00293-CR
_____

DON LEE LEWIS JR., Appellant

V.

THE STATE OF TEXAS, Appellee

_____

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-11-13613-CR**

_____

**MEMORANDUM OPINION**

Following an open plea of guilty to the first-degree felony offense of aggravated robbery using a firearm, Appellant Don Lee Lewis Jr. elected to have the trial court determine his punishment. *See* Tex. Penal Code Ann. § 29.03(a)(2), (b). The trial court conducted a punishment hearing and sentenced Lewis to thirty years of confinement. In two issues, Lewis challenges his punishment, asking whether: (1) the trial court abused its discretion in excluding evidence that prevented him from

1

presenting a defensive theory; and (2) he received ineffective assistance of counsel. As discussed more fully below, we affirm.

## Background and Punishment Trial Testimony[1]

### Testimony of Reginald Hernandez

Reginald Hernandez testified that he is a court liaison officer who interviewed Lewis and prepared the pre-sentence investigation (PSI) report. He testified that Lewis admitted he was aware of what he was doing the night of the robbery. Hernandez discussed Lewis's prior arrests and convictions. He also said that Lewis was doing well and complying with his bond conditions. Hernandez explained that his report did not mean he believed Lewis deserved probation or that he recommended probation. Yet if the court gave Lewis probation, Hernandez believed that Lewis would do well on probation.

### Testimony of Albert Chambers

When this incident occurred, Albert Chambers was a sergeant with the Montgomery Police Department and the lead detective on this case. Chambers interviewed Lewis, but the codefendant, Darius Huff, invoked his right to counsel, so he did not interview him. Chambers also interviewed the victim, CY, who was

---

[1]We limit our recitation of the background facts to those necessary to the appeal's resolution. *See* Tex. R. App. P. 47.1 (requiring the appellate court to hand down an opinion as brief as practicable that addresses all issues necessary to the appeal's resolution).

initially uncooperative. Chambers later learned that CY was not initially forthcoming, because he feared retaliation and being arrested for dealing drugs.

Chambers ultimately learned that this began as a drug transaction between Lewis and CY through Snapchat. CY told Chambers that Lewis owed him money, and CY wanted to collect his money, so he contacted Lewis to meet. Lewis then asked CY to bring an ounce of marijuana in exchange for a price of $120. CY told Chambers that Lewis and Darius Huff were involved in the robbery. Chambers testified that multiple times during the interview, CY told him that Lewis had a gun on him.

Lewis told Chambers he agreed to the arrangement to buy marijuana and picked the location. Chambers testified that Lewis had known CY since middle school and purchased marijuana from him in the past, and CY had loaned Lewis money. Chambers testified that Lewis confirmed he sent Snapchat messages to CY to purchase marijuana for $130, that Lewis did not have any money, and he decided to rob CY. He said that Lewis also admitted to driving. Chambers explained that Lewis admitted to letting the other codefendants out of the car before he met with CY, but after Lewis made CY get in the car, the codefendants got into the car's backseat. Lewis then demanded the marijuana from CY, who did not fight back and followed his directions. According to Chambers, Lewis also admitted knowing that CY was shot when he drove off.

3

Lewis told Chambers that Huff was armed and that Huff shot CY, but Chambers was unable to confirm that, because CY was shot from behind, and Chambers did not have a chance to interview Huff. According to Chambers, they do not know who shot CY and never will. He said this is typical of cases where the codefendants blame the others for being the shooter. Chambers testified that the bullet pierced CY's spinal cord, and bullet fragments remain lodged in his spine.

Finally, Chambers testified that after this investigation, another man contacted him about a similar incident involving Lewis and inquired if he could also file robbery charges. The man described an incident three years earlier when he sold marijuana to Lewis. Lewis and three others attacked him and pulled a gun on him.

**Testimony of CY**

CY testified that Lewis contacted him and said he would pay back some money he owed CY, plus he wanted to purchase some marijuana, for a total amount of $150. CY testified that he knew Lewis from school, and they hung out occasionally. CY explained that he was sitting at a swing set at the park where he and Lewis agreed to meet and saw a car pull up. He saw headlights, heard three doors shut, and observed feet. At the same time, CY received a text from Lewis saying he was there and asking where CY was. The car then parked, so CY walked from the swing set to the car, which he recognized as Lewis's. Lewis told CY to get in the car,

4

and CY asked Lewis about his money. Lewis responded he wanted to see "the set" first.

According to CY, when he showed the marijuana, Lewis "reached for it," but CY grabbed it back. CY testified that Lewis then lifted his shirt, and CY saw a gun. Lewis then told him it was a robbery and to hand the marijuana over. After Lewis told CY it was a robbery, Huff and the others got in the car, and CY saw that all but one of them had guns. When Huff entered the car, two others got in with them, but CY did not know who they were because they were all wearing ski masks.[2] CY testified that Lewis repeatedly told Huff to "cock" the gun. CY said he did not want any problems, so he handed Lewis what they wanted.

After CY gave the marijuana to them, Lewis and Huff told CY to get out of the car, and as he did, CY heard a "loud pop." CY said he dropped to the ground, felt an instant burning, and could not move his legs. Lewis was driving, and they left the way they came. CY testified that doctors cannot remove the bullet fragments in his spine, he suffers from paralysis and lead poisoning. He is also in constant pain.

CY testified that after being unable to reach his girlfriend, he called 9-1-1. His phone call to 9-1-1 was played without objection, where he says he does not know

---

[2]During CY's testimony, there was some discussion about whether four or three people were involved in the robbery. He explained that he was "doped up" on medication when he talked to Chambers at the hospital, but he tried to explain to Chambers there were three people in the backseat, and Lewis was driving. Everyone had masks on but Lewis, and CY identified Huff by his voice

5

who shot him. He explained that he was dishonest with police when he first called, because he did not want to get in trouble for selling marijuana. CY testified that he eventually "came clean" and told Chambers everything.

CY testified that he did not recall making statements on social media that Huff was the one who shot him. Defense Counsel showed him a statement from social media to see if it refreshed his recollection, but CY said he did not recall making a statement that Huff was the one who shot him. When the Defense Counsel offered the statement on social media, the State objected arguing that "it[] has not been authenticated in any way." The Defense Counsel then asked CY if he recalled having a Facebook Messenger conversation with Lewis's mother, Jean Hopkins, but CY denied knowing her. The State then objected that it was hearsay, which the trial court sustained. The Defense Counsel responded that it was not asking for the contents of the messages, only "trying to go for impeachment." CY again said he did not recall speaking with Hopkins and denied knowing her, although he had "hung out" at her house before. Finally, CY denied knowing anything about people making threats against Lewis or harassing him and his family after the incident.

**Testimony of Don Lee Lewis Jr.**

Lewis testified that he knew CY from junior high or high school, and they were friends. He said that he bought drugs from CY since 2019. He also identified the other person involved with him and Huff in the incident as Keith Lytle. Lewis

6

admitted he set up the buy with CY, and when he did, he knew that he was not going to pay for the marijuana. Lewis testified he just planned to snatch it out of CY's hands. Lewis denied that he or Lytle had guns, and he said he did not know that Huff would be carrying a weapon. Nevertheless, he agreed that taking the marijuana from CY's hand without paying during a robbery could get someone shot.

Lewis described the plan as meeting up with CY and just snatching the marijuana from him when he asked to see it. Instead, CY showed him the marijuana and when Lewis tried to grab it, Huff was in the back seat and pointed the gun at CY and demanded the marijuana. CY gave it to him, but when he got out of the car, Huff shot him. Lewis said he did not intend for CY to be shot that day. He denied possessing a firearm that day and that he told anyone else to "cock" a gun.

After Huff shot CY, Lewis was supposed to drive, but he froze, so Lytle put Lewis in the back seat and drove away himself, then they went to another friend's house. Lewis testified that he was under the influence of alcohol, Xanax and marijuana at the time. He explained that after the robbery, Lewis purchased more drugs, then they went to a Halloween party. Lewis said he did not help CY, but left him there, knowing he could have died.

**Testimony of Jean Hopkins**

Lewis again attempted to elicit testimony that CY told Lewis's mother, Jean Hopkins, through Facebook Messenger that Huff shot him, which was inconsistent

7

with CY's trial testimony that he did not know who shot him. Hopkins testified that she was harassed while Lewis was in jail, describing that her home was broken into, she was robbed, and raped. Hopkins testified that she contacted CY through Facebook Messenger. The Defense Counsel questioned her about her conversation with CY, and she said that CY told her who shot him. The State again objected based on hearsay, which the trial court sustained. Defense Counsel responded that she was impeaching CY, and he denied having any conversations with Hopkins, so extrinsic evidence of the conversations from the other participant in the conversations is admissible. The trial court said the objection was sustained, and Defense Counsel said she needed to make a bill, which the trial court said she could do it at the end of trial.

Hopkins also testified that she and CY discussed threats that were made and people harassing her at work and her belief that it was because of what happened with CY. The defense told the trial court that it was trying to show, contrary to CY's testimony, he spoke with Hopkins and told her that Huff shot him, and Lewis's family had been threatened since the robbery. The following exchange then occurred.

> [DEFENSE COUNSEL]: We are not arguing his relationship as a party. Yes. Mr. Lewis has absolute obligation as a party. We have pled guilty to that. But I think because it's been put forth that we don't know who shot him, it might as well have been [Lewis] as it was [Huff]. [CY] has stated he believes [Huff] is the one who shot him.

> THE COURT: My problem is that I don't find that relevant because he's already pled guilty to this offense. The victim is not on trial here.

8

[DEFENSE COUNSEL]: Yes, ma'am.

THE COURT: I don't know how it's relevant to what punishment should be given to your client as to whether [CY], you know, had some hate in his heart for this family. So, that really goes to this whole line of questioning.

[DEFENSE COUNSEL]: Yes, ma'am. I'll discontinue this line.

THE COURT: Well, it's just not even – it's not relevant anymore who shot the gun.

[DEFENSE COUNSEL]: Yes, ma'am.

THE COURT: Because the law of parties. I know your client is aware of that, but it's just – we're going down trails here that aren't really important to me. It doesn't -- I can absolutely believe that [CY] said that [Huff] shot him and then state it differently. It isn't going to make any difference to me. The ultimate thing -- and I can believe that he was even behind something threatening that was going on there with the family, which is not good thing if that's true, but it won't -- it just isn't relevant to what I have got to look at. . . [.]
. . .

THE COURT: Yeah. Okay. So, are you going to pursue this any further?

[DEFENSE COUNSEL]: No, ma'am. I am ready to move on.

Hopkins went on to describe positive changes that Lewis had made in his life since the shooting. These changes included graduating from school and getting a great job. Hopkins also testified that Lewis has not been using drugs.

9

**Testimony of Dr. Wendy Elliott**

Dr. Wendy Elliott is a forensic psychologist who testified for the defense. She testified that she met with Lewis and found him to be forthcoming, and he said he was remorseful. She explained that this occurred when Lewis was nineteen and at that age, the portion of the brain responsible for decision-making is not fully developed, likening it to "a car with an accelerator, but without a brake." She also explained that people that age make worse decisions when they are with peers. She discussed his vocational training and employment, which she said shows Lewis "has made an effort to change the way he was engaging with the world prior to this alleged incident." Nevertheless, she acknowledged that her opinion was based primarily on what Lewis told her.

**Other Evidence**

Apart from the above witnesses, a family friend also testified about positive changes in Lewis's life. Among other things, additional evidence admitted at trial included: aerial maps of the location; CY's medical records; the 9-1-1 call; letters from Lewis's family and friends outlining positive changes in his life; negative drug test results; and Lewis's school certificates.

**Arguments and Sentencing**

During opening and closing, the State argued that they would never know who pulled the trigger, and it does not matter, because Lewis arranged the crime. Prior to

pronouncing Lewis's sentence, the trial court noted that Lewis organized this, and CY was his friend. The trial court explained that Lewis's claim that he did not fire the gun did not matter; he was a party to this. The trial court stated that Lewis left CY lying there, not knowing if he was dead or alive and went to a Halloween party. The trial court noted the seriousness of CY's injuries and their lifelong ramifications. The trial court then sentenced Lewis to thirty years of confinement.

## Issue One: Exclusion of Evidence

In his first issue, Lewis asks whether the trial court abused its discretion when it excluded evidence, which prevented him from presenting evidence of a defensive theory, and if so, whether he was harmed. On appeal, Lewis argues that while all parties are guilty to the offense, the roles of each individual in the aggravated robbery become relevant for punishment. He also contends that CY's prior statement regarding who shot him is "material and probative" to assessing punishment for those involved in the robbery. We disagree for the reasons discussed below.

Trial courts are in the best position to determine questions of admissibility, so we review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). We will uphold a trial court's ruling on the admissibility of evidence if it is within the zone

of reasonable disagreement. *See Rodriguez*, 203 S.W.3d at 841; *Montgomery*, 810

S.W.2d at 391.

> Texas Code of Criminal Procedure article 37.07, provides:
>
> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1). Evidence is relevant if it tends to

make a fact more or less probable than it would be without the evidence, and the fact

is of consequence in determining the action. Tex. R. Evid. 401. Relevant evidence

is generally admissible. *Id.* 403. Even so, the Court of Criminal Appeals has

explained, "Rule 401 is helpful in determining what evidence should be admissible

under Article 37.07, §3(a), but the definition is not a perfect fit in the punishment

phase." *Ex Parte Rogers*, 369 S.W.3d 858, 863 (Tex. Crim. App. 2012) (citing

*Sunbury v. State*, 88 S.W.3d 229, 234 (Tex. Crim. App. 2002)).

"Relevancy in the punishment phase is 'a question of what is helpful to the

[factfinder] in determining the appropriate sentence for a particular defendant in a

particular case.'" *Ellison v. State*, 201 S.W.3d 714, 719 (Tex. Crim. App.

2006) (quoting *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999)). "The admissibility of evidence during the punishment phase of a non-capital felony offense is not a question of logical relevance but that of policy because there are no discrete factual issues at the punishment stage." *Napier v. State*, 887 S.W.2d 265, 266 (Tex. App.—Beaumont 1994) (citing *Miller–El v. State*, 782 S.W.2d 892 (Tex. Crim. App. 1989)); *see also Ellison*, 201 S.W.3d at 719 (citations omitted). In discussing punishment related to parties, the Court of Criminal Appeals has instructed, "'Each defendant should be judged by his own conduct and participation and by his own circumstances.'" *Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007) (quoting *Evans v. State*, 656 S.W.2d 65, 67 (Tex. Crim. App. 1983)).

Testimony that CY told others he believed Huff was the shooter, which was inconsistent with his trial testimony, might have had some bearing on his credibility as a witness and showing who pulled the trigger. Even so, the trial court as the factfinder could have determined that who pulled the trigger did not help determine the appropriate sentence for Lewis. *See Ellison*, 201 S.W.3d at 719. The trial court focused on Lewis's participation and explained that even if she believed the codefendant was the shooter, it did not matter. In deciding Lewis's punishment, the trial court highlighted that CY was Lewis's friend, Lewis arranged the meeting to buy marijuana, and Lewis left CY lying on the ground not knowing if he was alive or dead and then went to a party. Thus, the trial court seemingly judged Lewis by

his own conduct and participation by his own circumstances. *See Joubert*, 235 S.W.3d at 734. The trial court also focused on the severity and permanence of CY's injuries.

Based on the record before us, we conclude the trial court's determination that the complained-of evidence did not help assess Lewis's sentence in this case was within the zone of reasonable disagreement. *See Rodriguez*, 203 S.W.3d at 841; *Montgomery*, 810 S.W.2d at 391. Accordingly, the trial court did not abuse its discretion in excluding the complained-of evidence. We overrule issue one. *See Rodriguez*, 203 S.W.3d at 841; *Montgomery*, 810 S.W.2d at 391.

## Issue Two: Ineffective Assistance of Counsel

In his second issue, Lewis complains his trial counsel was ineffective for failing to pursue her questioning of Hopkins regarding threats and harassment she received from CY and his associates. He contends that had she not moved on from this line of questioning, the trial court would have heard and seen messages regarding Hopkins's conversation with CY about harassment she experienced.

To establish ineffective assistance of counsel, a defendant must satisfy the following test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing

14

> that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Perez v. State*, 310 S.W.3d 890, 892–93 (Tex. Crim. App. 2010). "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). A defendant is not entitled to errorless representation. *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013). We examine the totality of the representation when analyzing a claim of ineffectiveness. *See id.*; *see also Thompson*, 9 S.W.3d at 813. "To show prejudice, 'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (quoting *Strickland*, 466 U.S. at 694); *see also Graves v. State*, 310 S.W.3d 924, 928 (Tex. App.—Beaumont 2010, pet. ref'd).

"Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). "Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the presumption that counsel's conduct

was reasonable and professional." *Id.*; *see also Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (explaining record was insufficient to show counsel's representation was ineffective when record failed to show that counsel's representation lacked tactical and strategic decision-making). If trial counsel is not allowed to explain his actions, "then the appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

Lewis's ineffective-assistance claim fails on the first *Strickland* prong. He has failed to show trial counsel's performance was deficient, as the alleged ineffectiveness is not firmly founded in the record. *See Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892–93; *see also Thompson*, 9 S.W.3d at 812. Lewis did not file a motion for new trial nor was trial counsel afforded an opportunity to explain her actions. Without this, our review is highly deferential, and we presume "counsel's actions fell within the wide range of reasonable and professional assistance." *Bone*, 77 S.W.3d at 833. The record here is insufficient to show "that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome" that presumption. *Id.*; *see also Estrada*, 313 S.W.3d at 311. The record shows that trial counsel presented a strategy of attempting

to show that CY was not credible, and Lewis's family was "punished" by the threats and harassment they endured after this incident.

Counsel did not pursue the line of questioning further or make a bill after the trial court explained that even if the victim did these things, while troubling, it would not impact the punishment Lewis would receive. "Trial counsel is not required to engage in useless or futile acts." *Templeton v. State*, 629 S.W.3d 616, 625 (Tex. App.—Texarkana 2021, no pet.) (citations omitted). Counsel elicited testimony that Lewis's family was harassed and threatened, which they attributed to this incident. Her failure to pursue further questioning after being warned it would not impact the trial court's determination of Lewis's punishment is not "'so outrageous that no competent attorney would have engaged in it.'" *Menefield*, 363 S.W.3d at 593 (quoting *Goodspeed*, 187 S.W.3d at 392). Thus, we conclude that Lewis has failed to meet the first prong of the *Strickland* test. *See Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892–93. We overrule issue two.

## Conclusion

Having overruled Lewis's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on May 20, 2025
Opinion Delivered August 27, 2025
Do Not Publish
Before Golemon, C.J., Johnson and Chambers, JJ.